**CITY OF COLD SPRING, a Municipal Corporation, Appellant,**

**v.**

**Ralph ROSS, Appellee.**

Court of Appeals of Kentucky.

June 15, 1962.

John J. O'Hara, Marion W. Moore, Blakely, Moore & O'Hara, Covington, for appellant.

George T. Muehlenkamp, Carl H. Ebert, Newport, for appellee.

PALMORE, Judge.

The City of Cold Spring appeals from a judgment entered against it pursuant to a jury verdict awarding the appellee, Ralph Ross, $30,000 for personal injuries and damages arising out of an accident in which his right foot was run over and crushed by a backhoe, a heavy piece of earth-moving equipment which was being used to dig through frozen ground to a broken water main. Though several errors are alleged, we have found it necessary to consider only the question of whether the city was entitled to a directed verdict.

Our decision calls for a detailed statement of the facts.

U. S. Highway 27 as it passes through the City of Cold Spring is four lanes wide and runs in a north-south direction. It is paralleled on the west side by a concrete sidewalk separated from the curb of the highway by a narrow grass plot. Also parallel with the highway and sidewalk, and located underground within the grass plot between them, is a water main owned by the city. During subzero weather on February 18, 1958, the ground became frozen to a depth of 16 or 18 inches and a break developed in the water line at a point some 300 feet north of Fahrenholtz

Cafe, a tavern on the west side of the highway. During the afternoon, efforts were made to dig through the frozen ground and reach the break by use of an ordinary farm-type tractor equipped with a boom and bucket, but they proved inadequate to the task, and toward the end of the day the city officials called for the services of a backhoe owned by Carlisle Construction Company, an excavating contractor.

This backhoe was a large diesel-powered machine weighing about 25 tons and operating on steel tracks, or caterpillar treads. The cab and tracks were some 12 feet wide by 13 feet long with a boom and bucket attachment mounted forward, extensible to a length of approximately 18 feet from the cab. The normal method of operation with this type of equipment is to drop the bucket, which bites into the ground, and then pull it toward the cab, in the fashion of a man with a hoe. The cab can be rotated so that the bucket may be filled or emptied anywhere within the radius of the boom as extended by the arm of the bucket. From his seat in the cab of the particular unit in question the operator could see forward and to the sides, but had no means to see behind the cab unless he put his head out of the window to his left and looked back. There were two lights on the front side of the machine but none on the back.

Carlisle's operator, Shields, arrived on the scene and began digging at about 9:30 or 9:45 P.M. After working for a few minutes from the north side of the excavation, and upon its being discovered that the break in the water main lay southward of the hole that had been dug, he switched the backhoe to the south side, with the boom pointing north. The tracks of the machine were positioned astraddle the grass plot and parallel with the highway, one in the westernmost vehicular traffic lane and the other on the sidewalk, partially blocking it but leaving open a narrow strip of the pavement bordered on the west by a sloping, terrace-like bank

rising to an open field some 5 or 6 feet above street level. At approximately 10:45 P.M., while the digging operation continued in progess, the appellee, Ross, walking northward along the sidewalk from the tavern, encountered the backhoe in the dark and was injured. But before proceeding to describe the accident let us complete the physical setting and fill in the preliminary circumstances.

By the time the Carlisle equipment arrived one of the city officials in charge of the situation had placed a "Men Working" sign and barricade at the west edge of the highway about 100 yards north of the break in the water main. Another barricade was set a little farther south in the westernmost traffic lane. 10 or 12 kerosene lamps of the type known as "smudge pots" or "pot lamps" were arranged around these barricades and along the line between the first and second southbound lanes of the highway so as to direct the traffic on that side into a single lane and safely around the emergency work area. The line of lighted smudge pots extended southward to a point abreast or just beyond the location of the backhoe. Immediately behind and south of the backhoe a city truck was parked beside the west curb of the highway, facing south toward the tavern. On the bed of this truck was an air compressor providing the power to operate a jackhammer which, a few minutes before the accident, had been used to break up the frozen ground at the point of excavation and an adjacent portion of sidewalk.

Illumination for the work being done was furnished by three 500-watt portable lights powered by a gasoline motor and generator unit. One of these was used manually in front of the backhoe so as to direct its beam into the excavation. The other two were separately placed several feet west of the sidewalk at an elevation of about 6 feet above the street level in the open field and were beamed toward the backhoe. (There was some confusion in the evidence as to the exact

arrangement of these two lights, but the version adopted here seems least disadvantageous to the plaintiff's case.) Also in the field, some 10 or 12 feet west of the sidewalk at a point opposite the boom of the backhoe, a fire had been kindled in a metal drum or barrel, around which the various observers and supervising officials on the scene gathered from time to time for warmth.

It is conceded that there were no lights, barriers or warning signals on the sidewalk to the south of the backhoe toward Fahrenholtz Cafe, nor was there a watchman or lookout to intercept an approaching pedestrian. The city did not have any street lights. There was, however, what must have been an appreciable amount of noise from the simultaneously running motors of the air compressor idling on the bed of the city truck, the gasoline-driven generator unit in the field, and the diesel-powered backhoe itself.

The appellee, Ross, was 32 years old and had 12 years of experience in construction work. He had been employed as a bulldozer operator on and off for 3 years preceding the date of the accident, but was unemployed at the time. He resided in the vicinity of Cold Spring somewhere to the south of Fahrenholtz Cafe. Having learned of the break in the water main, he and a friend, Dick Fehler, came to the cafe at about 1:00 P.M. hoping to obtain temporary employment in connection with the emergency. He left his car in the tavern parking lot and proceeded to watch the unsuccessful operations of the farm tractor all afternoon, retiring to the tavern 2 or 3 times in order to get warm. He did not, however, drink any alcoholic beverages during this time. Ross's last trip to the tavern was made at about 5:30 P.M., just after the efforts to excavate with the tractor were given up as useless. At 6:00 P.M. Elmer Schultz, the mayor of Cold Spring, entered the tavern to use the telephone, and Ross asked about the possibility of helping with the work but was told that Carlisle had been called. On this occasion the mayor bought him the first three beers he admits having consumed over the course of the evening prior to the accident. Though he was "broke" and had no means to buy food or drink, Ross nevertheless remained in the cafe steadily, and without again visiting the area of the broken main until about 10:30 P.M., when he decided it was time to go home. The evidence as to whether he was sober at this time being in conflict, the presumption here is that he was. He had last seen his companion, Dick Fehler, several hours earlier, but it occurred to him that Dick might be up at the digging job, so he decided to go there to find him before departing homeward in the opposite direction. Actually, Fehler had gone home with someone else at about 6:00 P.M.

Ross was familiar with the general characteristics and method of operation of the machine being used to effect the excavation. He testified, "I knew what it would be when Elmer told me they were sending a backhoe out." He knew also that it had arrived, because he had seen and talked to Shields, the operator, who had come to the cafe for a sandwich and coffee a short while earlier. He did not, of course, know precisely how the backhoe had been positioned with respect to the street and sidewalk. According to his own and Fehler's testimony, the farm tractor used during the afternoon had operated from a position in the open field west of the sidewalk, with the boom extending over and across the walk. (Fehler acknowledged, however, that the normal way to expose a broken main would be to dig in a fore-and-aft direction with, rather than crosswise to, the pipeline.)

According to Ross, the night was dark and he could scarcely have seen his hand at a distance of 18 inches in front of his face. There was, he said, ice and snow on the sidewalk. As he approached the work area he did not observe any of the lights or illumination heretofore mentioned, except for the fire in the barrel to the side and front of the backhoe. He

did, however, hear the air compressor as he passed by the parked city truck and approached within some 15 feet of the backhoe. From this point on Ross's testimony as to precise details was not altogether consistent, but the gist of it is this: He came up on the machine and started to pass around it to his left. Having noticed that some men were standing about the fire at the barrel he decided to go up the slope and see who they were. As he took the first step in that direction, with one foot on the bank and the other still on the sidewalk, the bucket struck the ground and he slipped and fell. At this instant he was near the left rear corner of the backhoe, within two feet of its track or tread, but he never saw it until he was on the ground and caught sight of the lights up forward through the space between the tracks. After saying at one point that he did not hear the noise of the diesel motor until he was underneath it, on later cross-examination he admitted that he heard it and, at least, sensed its presence before he fell:

> Q- "So that we understand it, you knew the backhoe was there because you were walking around it, is that right?
>
> A- "I didn't actually see it until I felt it. I heard the backhoe running.
>
> Q- "But you have just told me now that in walking up the bank you were trying to go around the backhoe?
>
> A- "Correct."

The operation of the backhoe in prying away at the stiffly frozen earth involved a more or less constant shuttling back and forth, and immediately after Ross hit the ground he saw it backing rapidly toward him. He shouted for it to stop, but amid the clamor of the various machines in operation his cries were not heard, and one of the tracks of the backhoe ran over his right foot.

The trial court ruled as a matter of law that in operating the backhoe Shields was acting as the servant of the City of Cold Spring. The instructions submitted the question of liability on two theories, (a) negligent operation of the machine and (b) negligent failure of the city to provide reasonable warning to pedestrians using the sidewalk. The defenses of contributory negligence and assumed risk also were submitted to the jury. By unanimous verdict Shields was absolved of any fault in the handling of the machine. A verdict signed by nine members of the jury found the city negligent "for not having means as were reasonably necessary and sufficient to warn pedestrians using or about to use said sidewalk" and awarded the plaintiff his damages.

The distinction that raises assumption of risk to the status of a separate defense from contributory negligence is subtle to the point of questionable legitimacy. Certainly in many cases the two theories so overlap that "it makes little difference which the defense is called." Prosser on Torts (2d ed., 1955), pp. 304–5. Porter v. Cornett, 1947, 306 Ky. 25, 206 S.W.2d 83. This is one of those cases, and in it we find the question of proximate cause to be nearly as indistinguishable from those two defenses as they are from each other. On any one of the three we are forced to the conclusion that the evidence of Ross's own fault as a causative factor in the accident was clear enough to preclude submission of the case to the jury.

■ Considering first the question of proximate cause, concede for the moment that the city was negligent in its failure to provide adequate warning for the benefit of approaching pedestrians. This particular pedestrian already knew all that the ordinary warning would have told him. A barricade, a lighted sign saying "Danger—Excavation Work Ahead—Heavy Machinery," or both of these together, could have given him no new information. He knew these things without any warn-

ing from the city, hence its neglect to provide such warning could not have been a proximate cause of the accident.

It is strongly argued that Ross's information was not specific enough to charge him with notice, particularly in that he did not know that the backhoe was positioned partly on the sidewalk, and to the south of the spot where the break was thought to be, whereas the farm tractor he had observed during the afternoon had been operated from a different position. But if a warning had been posted and brought to the pedestrian's attention it would have been sufficient without these details. The city could not reasonably have been expected to maintain a detailed sketch or a television picture of what was going on at the scene of the emergency. A warning sign conveying all the information that was known by Ross as he approached the backhoe would have been fully adequate to discharge the city's duty to furnish reasonable notice that an area of danger lay directly ahead.

The same basic principle was applied to a different but analogous fact situation in Clardy v. Robinson, Ky.1955, 284 S.W.2d 651. A grain truck stopped in the highway at night in response to an apparent emergency in the form of a disabled hay truck on the left or opposite side of the road. The hay truck's headlights were on, facing in the direction from which the grain truck had come, and the driver of the hay truck was moving about the front of his disabled vehicle with a flashlight. A coal truck coming along the highway ran into the rear of the grain truck, and a passenger in this coal truck was killed. In a suit by the administrator a verdict was directed in favor of the driver of the grain truck, though it was claimed that the grain truck's taillights were not burning. Affirming, this court noted that even if the taillights were not burning, thus preventing the approaching driver from seeing the grain truck, the driver of the coal truck nevertheless saw the disabled hay truck and a "bunch of lights" on the side of the road

from a distance of 250 feet away and took no precautions to slow down or stop until too late. The coal truck driver's knowledge "that *an unusual traffic condition* existed ahead of him" (emphasis added) was held to have eliminated the absence of taillights on the grain truck as a causative factor in the accident.

■ "While proximate cause is normally a question for the jury, it becomes a question of law where there is no dispute about the essential facts of causation and but one conclusion may reasonably be drawn from the evidence." Clardy v. Robinson, id. On that particular question we consider this to be a stronger case against the plaintiff than the Clardy case. Certainly Ross had more information concerning the nature and details of the "unusual" condition existing ahead of him than did the coal truck driver in the Clardy case.

Referring now to the questions of assumed risk and contributory negligence, in this case the fundamental test in each is whether, in view of the knowledge Ross had, he exercised ordinary care for his own safety. Cf. Porter v. Cornett, 1947, 306 Ky. 25, 206 S.W.2d 83, 87; Restatement of Torts, § 466. And as we have already suggested, this is almost the same as the proximate cause issue, in that if Ross's information was such that the ordinarily prudent man would have been deterred from acting as he did, then the city's failure to give warning was not a cause of the accident.

■ Ross knew where the digging operation was taking place. He knew the broken water main lay in the grass plot next to the sidewalk. He knew the type of equipment being used, and from his ample experience in construction work he was familiar with its method of operation. There was no pressing need for his returning to the scene before leaving for his home, which lay in the other direction. (He testified that he had not seen Fehler since 1:00 P.M.) As he approached the

backhoe he heard the compressor running, and must have heard the diesel motor of the backhoe as well (whether or not the various sounds were separately distinguishable). An ordinarily prudent man with Ross's knowledge and experience would have been at once aware that the backhoe was somewhere very near and that its presence was a menace. True, he did not know at this point just where the big machine was positioned, but what he did know was enough to put him on guard. Even if the backhoe had been operating from the field to his left, as he says the tractor had operated during the afternoon, it would have had to swing its boom and bucket across the sidewalk, and he was bound to anticipate that at some unseen point not far in front of him the way was obstructed by the work. That it was too dark to see should have conduced to greater than usual alertness. So should the fact that the ice and snow on the walkway made the footing treacherous. Under these circumstances would the reasonable man, whom we erect in the mind's eye as the exemplar of ordinarily prudent conduct, have assumed the sidewalk was clear, and walked blindly onward into a darkness filled with the sounds of working machinery? We cannot think so. But this man did. He continued on, and thereby consciously thrust himself into a position of peril. The only fair conclusion we can reach is that with the knowledge he had Ross did not act with ordinary prudence, and whether the city was negligent or not, without his own negligence the accident would not have happened. A pedestrian cannot reasonably presume that the public way is safe for travel beyond the point where common sense ought to raise a healthy suspicion to the contrary. Cf. 19 McQuillin, Municipal Corporations, § 54.120, pp. 442–443. "Walking by faith alone is not sufficient care." 2 Antieau, Municipal Corporation Law, § 11.15, p. 73.

Several cases cited in support of the judgment should be distinguished. In City of Hazard v. Scruggs, 1948, 307 Ky. 516, 211 S.W.2d 683, there is nothing in the opinion to indicate what, if any, foreknowledge the successful plaintiff had with reference to the existence or location of the ditch into which she fell. In West Kentucky Telephone Co. v. Pharis, 1904, 25 Ky.Law Rep. 1839, 78 S.W. 917, a heavy sleet had caused telephone wires to fall into the sidewalks and streets. Several days later the plaintiff fell over one or more of these wires partially submerged in the snow and ice. She had walked along the same path of travel four days earlier and had then observed the general condition, but it was held that this circumstance did not make her contributorily negligent as a matter of law. In support, the opinion cited authority to the effect that although a dangerous condition may have been observed by the plaintiff, if through forgetfulness he later walks into it he is not necessarily negligent. However, this principle has since been repudiated by our court. See Crain v. City of Louisville, Ky. 1953, 259 S.W.2d 52. Compare also the case of Peerless Mfg. Corp. v. Davenport, 1940, 281 Ky. 654, 136 S.W.2d 779.

■ In Myers & Clark Company v. Layne, Ky.1958, 312 S.W.2d 463, recovery by a pedestrian struck by a car while walking across a highway was upheld against the contention that she was contributorily negligent as a matter of law. The rationale of the decision was that a pedestrian in a "crosswalk" has the right-of-way over vehicular traffic. But the exercise of a "right" does not necessarily insulate the actor against a defense of contributory negligence or assumed risk. For example, as it was pointed out in Morrison & Conklin Const. Co. v. Cooper, Ky.1953, 256 S.W.2d 505, one may not with impunity court the risk of attack by a raging lion in order to exercise a right that is inconsequential in comparison with the danger. Again, the test is what the reasonable man would do. If the risk is so great that the reasonable man would forego the exercise of his right or privilege rather than encounter it, then

*it is* negligent *to undertake it.* Restatement of Torts, § 473.

We acknowledge, of course, that the question of contributory negligence should not lightly be taken from the jury. The same is true with respect to any material issue of fact. But the court cannot evade the responsibility of determining whether the evidence is such that the question could be fairly and reasonably resolved either way. In this particular case it is a most unpleasant responsibility. We can well understand what sympathy the jurors must have felt for the plaintiff, and how great the temptation to render aid at the expense of an impersonal defendant. It is in just such a case that a dispassionate court is the defendant's only guaranty that his rights will be determined by the rule of law.

The judgment is reversed with directions that a judgment be entered in favor of the City of Cold Spring.

MILLIKEN, J., not sitting.